Opinion
 

 VARTABEDIAN, J.
 

 Daniel Perez Martinez was convicted of arson (Pen. Code, § 451),
 
 [1]
 
 two counts of attempted arson (§ 455), and two counts of making terrorist threats (§ 422). In addition, it was found he suffered a prior conviction within the meaning of section 667. Defendant appeals, claiming there is insufficient evidence to support the terrorist threat convictions. He also claims the trial court erred in admitting evidence of his prior conviction of making a terrorist threat. We affirm.
 

 Facts
 

 Defendant and Ramona Garcia had an on-again, off-again, boyfriend-girlfriend relationship for four to five years. On May 2, 1995, defendant was living with Ramona. That day, Ramona was working at Kern Medical Center, pulling weeds from the exterior landscaping; she was supervised by Robert Iorio. Defendant came by to see Ramona and help her with her work.
 

 lorio saw defendant talking with Ramona and asked defendant to leave because he did not want Ramona to be bothered while she was working. Defendant said he would leave in a few minutes. lorio walked away. Five to
 
 *1215
 
 ten minutes later, lorio saw that defendant was still talking to Ramona. lorio walked back and defendant said to him, “I’ll leave.” lorio said, “Now.” lorio walked away and waited three to four minutes. Defendant remained with Ramona.
 

 As lorio began to walk back toward Ramona and defendant, defendant got on his bike and rode quickly in lorio’s direction. Defendant rode directly over to lorio and got off his bike. Getting “right in lorio’s face,” defendant started yelling and cussing at him. Defendant told lorio, “I’m going to get you.” lorio responded that defendant should leave. Defendant got extremely irritated, got on his bike, and as he was leaving said to lorio, “I’ll get back to you, I’ll get you.” Thinking defendant was going to come at him with punches, lorio replied that was “just fine with him.” lorio was expecting “blows,” “right then and there.” He had no idea how defendant was going to get him. Defendant left and lorio did not see him anymore that day.
 

 After she had finished working, Ramona saw defendant later that day. Defendant told her he was going to blow up Kern Medical Center. Later that evening, while they were out, defendant and Ramona got into a physical altercation. Defendant threatened to blow up Ramona’s car. Ramona left defendant and drove home. Sometime during the evening, defendant also threatened to blow up Ramona’s home.
 

 When Ramona returned home she parked her car away from her apartment, down the alley by some other apartments, because she did not want defendant to find her car. Ramona called her estranged husband, Ruben Garcia, and asked him to stay with her because she knew defendant would come back. Ruben agreed to stay with Ramona.
 

 Defendant came to Ramona’s house three or more times that evening and in the early morning hours of May 3, 1995. On each occasion, Ruben told defendant that Ramona was not there. On the third visit, Ruben allowed defendant to take a bike belonging to Ramona’s daughter; defendant had previously used the bike for transportation.
 

 lorio thought about defendant’s threat throughout the day on May 2,1995. It worried him, and he started wondering how defendant was going to get back at him. He reported defendant’s threat to security when he arrived at work on May 3, 1995, at approximately 4:45 a.m.
 

 At 4:50 a.m. on May 3, 1995, a security guard discovered a fire between the chlorine shack and the auxiliary house at Kern Medical Center. He put the fire out with a fire extinguisher.
 

 
 *1216
 
 At approximately 6 a.m. on May 3, 1995, Ruben Garcia went out to get Ramona’s car. The gas cap was missing from the car and a piece of charred paper was protruding from the gas tank opening. The windshield was broken and there were several dents in the hood of her car.
 

 At approximately 7:15 a.m. on May 3, 1995, the forklift operator at Kern Medical Center discovered that the forklift was missing its gas cap. A rag had been stuffed inside the gas tank and the forklift was scorched. A can of oil was found nearby.
 

 An arson investigator investigated the two fires at Kern Medical Center. There was a can of capella oil near the forklift fire, and there were oily drops between the location of the forklift fire and the auxiliary house fire. There were bicycle track marks between the two fires. The investigator also investigated the attempt to set Ramona’s car on fire. He found three empty beer cans near her car. All of the fires had been intentionally set.
 

 Defendant was arrested later that morning. He was found in a shed at his mother’s home. There were empty beer cans of the same brand found by Ramona’s car in the shed. In addition, there was a bike with an oily substance on the right pedal. The oil on the bike pedal was consistent with the oil on the rag found in the forklift and the oil in the container found nearby.
 

 Marlene Salvador had previously been friends with Ramona. She testified that in November of 1994 she and defendant got in an argument. Defendant came to her house and poured gasoline around the house. When Marlene opened the door, defendant asked her if she wanted him to light her house on fire. Defendant was convicted of violating section 422 as a result of this. Ramona was with defendant when the event occurred and was aware of defendant’s conviction. This evidence was admitted only on the question of whether Ramona was in sustained fear when defendant threatened her.
 

 Defense
 

 Defendant’s brother testified that he and defendant worked on cars together and often used gear oil. An expert testified on behalf of defendant regarding the oil on the bike and the oil found at the scene, challenging the tests run by the People.
 

 
 *1217
 
 Discussion
 

 I.
 

 Substantial Evidence
 

 Section 422 provides in pertinent part: “Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family’s safety, shall be punished by imprisonment in the county jail not to exceed one year, or by imprisonment in the state prison.”
 

 Section 422 is part of the California Street Terrorism Enforcement and Prevention Act passed by the Legislature in 1988. “A portion of that act provides: ‘The Legislature hereby finds and declares that it is the right of every person ... to be
 
 secure and protected from fear, intimidation,
 
 and physical harm caused by the activities of violent groups and individuals. It is not the intent of this chapter to interfere with the exercise of the constitutionally protected rights of freedom of expression and association. [¶] The Legislature, however, . . . finds that the State of California is in a state of crisis which has been caused by violent street gangs whose members
 
 threaten, terrorize,
 
 and commit a multitude of crimes against the peaceful citizens of their neighborhoods. These activities . . . present a clear and present danger to public order and safety and are not constitutionally protected.’ (Pen. Code, § 186.21, italics added.)”
 
 (People
 
 v.
 
 Brooks
 
 (1994) 26 Cal.App.4th 142, 149 [31 Cal.Rptr.2d 283].)
 

 Defendant was convicted in count IV of threatening Ramona and in count V of threatening Iorio pursuant to section 422.
 

 Nothing in the threat against Ramona, claims defendant, concerned inflicting great bodily injury or death. He further argues his words to Ramona did not carry any immediacy, nor did they result in Ramona’s being in sustained fear.
 

 Defendant asserts the evidence is also insufficient to support the separate section 422 conviction involving lorio. In particular, defendant contends the
 
 *1218
 
 threats to lorio did not convey a threat of great bodily injury or death and the threat was little more than males assuming a “machismo posture.” According to defendant, the threat to lorio did not convey immediacy nor did it result in sustained fear.
 

 A.
 
 Threat of Great Bodily Injury or Death.
 

 Defendant argues his threat to lorio was vague and did not specifically convey a threat of great bodily injury or death; he claims it was little more than “mouthing off’ and posturing.
 

 We agree that the words, “I’m going to get you,” “I’ll get back to you,” “I’ll get you,” may not, standing alone, convey a threat to commit a crime which will result in death or great bodily injury. But, as shall be discussed, we find that the meaning of the threat by defendant must be gleaned from the words and all of the surrounding circumstances.
 

 Appellate courts have disagreed whether a threat is to be judged solely on the words spoken or if the words should be interpreted based on all the surrounding circumstances. Although we acknowledge these cases involve a different aspect of section 422 than the aspect we are determining here, the discussions regarding the interpretation of a threat based on only the facial content of the language used, versus an interpretation based on all the surrounding circumstances, are pertinent to our decision.
 

 The appellate court in
 
 People
 
 v.
 
 Brown
 
 (1993) 20 Cal.App.4th 1251 [25 Cal.Rptr.2d 76] took a very restricted approach in determining if a threat satisfied section 422. In
 
 Brown,
 
 Gloria Ortega and Nora Moya were walking to their apartment when they noticed defendant screaming at someone. Defendant asked Ortega, “What are you looking at bitch?” and walked over to where Ortega, Moya and their children were standing. Defendant told the women and children: “ ‘he didn’t want Hispanic people around [here].’ As Ms. Moya was trying to open her apartment door appellant again said to Ms. Ortega, ‘What are you looking at, bitch?’ and pulled out a pistol from the small of his back. Appellant, about two feet from Ms. Ortega, pointed the gun at her temple. She asked him why he was doing this since they weren’t doing anything to him. Appellant told her to ‘shut up.’ The children were crying when Ms. Moya finally unlocked and opened the doors to her apartment.
 

 “Appellant, still holding his gun on Ms. Ortega, said ‘he didn’t like having Hispanic people there and that he was going to get us out of there.’
 

 “After the children ran into the apartment Ms. Moya pulled Ms. Ortega into the apartment. When Ms. Ortega tried to close one of the two doors, the
 
 *1219
 
 metal door, appellant stuck his foot in the way. Ms. Moya then said ‘we should call the police.’ Appellant, holding his pistol in front of him with both hands, said ‘if we called the police, he would kill us.’ Appellant then left.
 

 “Two days later, in the afternoon, Ms. Ortega saw appellant come from his nearby apartment toward her apartment and fire a pistol shot into the grass.
 

 “Thereafter, the women reported the matter to the police and appellant was arrested.”
 
 (People
 
 v.
 
 Brown, supra,
 
 20 Cal.App.4th at p. 1253, brackets in original.)
 

 Defendant was convicted of several crimes, including one violation of section 422 based on his threat to kill the women. On appeal, defendant claimed that because his threat was conditional, it did not meet the requirements of section 422. The appellate court agreed, stating that the “evidence appellant violated section 422 consisted
 
 solely
 
 of his statement to Ms. Ortega and Ms. Moya that “ ‘if [they] called the police, he would kill [them].’5” (20 Cal.App.4th at. p. 1254, italics added.)
 

 Footnote 5 provides: “Appellant’s other threat (that ‘he didn’t like having Hispanic people there and that he was going to get [them] out of there’) did not involve ‘death or great bodily injury’ and was not relied on in the trial court nor by respondent in this appeal.” (20 Cal.App.4th at p. 1254, fn. 5.)
 

 In analyzing the conditional nature of a threat, the court in
 
 People
 
 v.
 
 Brooks, supra,
 
 26 Cal.App.4th at page 149 took a different view than
 
 Brown
 
 and looked beyond the spoken words to determine the meaning to be given to the threat. The court stated, “Conditional threats are true threats if their context reasonably conveys to the victim that they are intended, and the First Amendment is not implicated by such threats since they do not concern political or social discourse or the so-called marketplace of ideas.”
 

 People
 
 v.
 
 Gudger
 
 (1994) 29 Cal.App.4th 310 [34 Cal.Rptr.2d 510] applied the
 
 Brooks
 
 rationale and disagreed with
 
 Brown.
 
 “A literal approach to the so-called conditional language used is not determinative in an analysis of the sufficiency of the evidence guided by First Amendment concerns. The touchstone of our analysis is thus not solely whether the language used in the threat is couched in a conditional grammatical construction. Rather, it is necessary to review the language and context of the threat to determine if the speaker had the specific intent that the statement was to be taken as a threat.”
 
 (Id.
 
 at p. 321.)
 

 People
 
 v.
 
 Stanfield
 
 (1995) 32 Cal.App.4th 1152 [38 Cal.Rptr.2d 328] is in accord with
 
 Brooks.
 
 The court in
 
 Stanfield
 
 found that the
 
 Brown
 
 court
 
 *1220
 
 construction of the statute: “would lead to the absurd result that any threatener could escape punishment by simply appending to an otherwise unconditional threat any condition, including ‘if the sun rises tomorrow.’ The statute does not require this result because it does not concentrate on the precise words of the threat. Instead, the statute focuses on the effect of the threat on the victim, to wit, communication of a gravity of purpose and immediate prospect of execution of the threat. These impressions are as surely conveyed to a victim when the threatened harm is conditioned on an occurrence guaranteed to happen as when the threat is absolutely unconditional.”
 
 (Id.
 
 at p. 1158; see also
 
 People
 
 v.
 
 Dias
 
 (1997) 52 Cal.App.4th 46 [60 Cal.Rptr.2d 443].)
 

 In
 
 In re David L.
 
 (1991) 234 Cal.App.3d 1655 [286 Cal.Rptr. 398], the appellate court was called upon to determine if the evidence was sufficient to support the requirement of threatening to commit a crime which will result in death or great bodily injury. It found the threat to be sufficiently specific to meet this requirement. David L. had been harassing Neis. David called Stephanie and made a metallic clicking sound with a gun into the phone; he told Stephanie he was going to shoot Neis. Stephanie relayed the threat to Neis. The court held that although David’s threat to shoot the victim did not communicate a time or precise manner of execution, it was sufficiently specific to satisfy the requirement of threatening death or great bodily injury.
 
 (Id.
 
 at p. 1660.)
 

 Although the court in
 
 People
 
 v.
 
 Brown, supra,
 
 20 Cal.App.4th 1251 , looked solely to the spoken words in determining the conditional nature of the threat and implied at page 1254, footnote 5, that the language of the threat itself had to involve great bodily injury or death in order to fall within section 422, we find the authorities contrary to
 
 Brown
 
 to be more persuasive. We choose to take into account all of the surrounding circumstances in determining if a threat falls within section 422.
 
 (People
 
 v.
 
 Stanfield, supra,
 
 32 Cal.App.4th at p. 1158;
 
 People
 
 v.
 
 Brooks, supra,
 
 26 Cal.App.4th at p. 149.) The statute specifically requires one to look at the threat on its face
 
 and
 
 under the circumstances in which it is made.
 

 While defendant’s words did not specifically mention activities which would clearly result in great bodily injury or death and he made no clear gestures when he threatened lorio, he approached lorio quickly, he yelled and cursed at him, he got within very close proximity to his face, and he displayed very angry behavior. Furthermore, defendant’s activities after the making of the threat support a finding that he was threatening death or great bodily injury to lorio.
 

 Although section 422 does not require an intent to actually carry out the threatened crime, if the defendant does carry out his threat, his actions might
 
 *1221
 
 demonstrate what he meant when he made the threat, thereby giving meaning to the words spoken. By analogy, the California Supreme Court has found it permissible for the jury to look to defendant’s post-murder activities to aid in its determination of premeditation and deliberation.
 

 “Additionally, the conduct of defendant
 
 after
 
 the stabbing, such as the search of dresser drawers, jewelry boxes, kitchen drawers and the changing of a Band-Aid on his bloody hand, would appear to be inconsistent with a state of mind that would have produced a rash, impulsive killing. Here, defendant did not immediately flee the scene. Again, while not sufficient in themselves to establish premeditation and deliberation, these are facts which a jury could reasonably consider in relation to the manner of killing.”
 
 (People
 
 v.
 
 Perez
 
 (1992) 2 Cal.4th 1117, 1128 [9 Cal.Rptr.2d 577, 831 P.2d 1159].)'
 

 Here, defendant threatened to get lorio. He set fire to the building which housed the auxiliary meeting place and the groundskeeping shop. The fire was discovered at 4:50 a.m.; lorio reported to work at 4:45 a.m. While there was no direct evidence to demonstrate whether defendant knew when or where lorio reported to work, such knowledge is inferable from the facts. Thus, defendant’s threat to get back at lorio may have been meant as a threat to bum down the shop where lorio was located, clearly a crime which could result in death or great bodily injury.
 

 Defendant’s words, combined with the surrounding circumstances, are susceptible to an interpretation that defendant made a grave threat to lorio’s personal safety. His threats were not subject to protection on the basis that they were couched in ambiguous terms. Defendant was extremely angry, was cursing at lorio and was in very close proximity to lorio when he made the threats. This type of situation can be very intimidating and can carry an aura of serious danger. Defendant’s activities after the threat give meaning to the words and imply that he meant serious business when he made the threat.
 
 [2]
 

 In enacting section 422 as part of the California Street Terrorism and Enforcement Prevention Act, the Legislature declared that every person has the right to be protected from fear and intimidation. This act was in response to the growing number and severity of threats against peaceful citizens. In light of this strong public policy and in light of the facts, the threat by defendant to lorio, taken in the context of all the surrounding circumstances, meets the requirement of a threat to commit a crime which will result in death or great bodily injury to another person.
 

 
 *1222
 
 Defendant also argues there was nothing said to Ramona which concerned inflicting great bodily injury to Ramona or which implied that he would kill her.
 

 Ramona was a very reluctant witness and expressed her continuing love for defendant. Her contentions that defendant did not threaten on May 2, 1995, to blow up her car or her home were impeached with her preliminary hearing testimony. Her claims were also contradicted by her activities that evening of moving her car and asking her estranged husband to stay with her.
 

 Defendant threatened to blow up Ramona’s house. He did this after getting into an argument with her and hitting her. Ramona was with defendant when he poured gasoline around Marlene Salvador’s house and she knew defendant was convicted of violating section 422 for those actions. Defendant clearly knew where Ramona lived and knew her habits. The words used and the circumstances surrounding the words strongly evince a threat to commit a crime which would result in death or great bodily injury to Ramona.
 

 B.,
 
 C
 

 *
 

 II.
 

 Admission of Prior Section 422
 
 Conviction
 
 *
 

 Disposition
 

 The judgment is affirmed.
 

 Martin, Acting P. J., and Wiseman, J., concurred.
 

 Appellant’s petition for review by the Supreme Court was denied June 25, 1997.
 

 [1]
 

 All future code references are to the Penal Code unless otherwise noted.
 

 [2]
 

 While there is a constitutional right to free speech, the category of speech used here is not of the type deserving First Amendment protection.
 
 (People
 
 v.
 
 Brooks, supra,
 
 26 Cal.App.4th at pp. 147-148.)
 

 *
 

 See footnote,
 
 ante,
 
 page 1212.